Filed 6/6/23  P. v. Smith CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH SMITH,<br><br>    Defendant and Appellant. | F084446<br><br>(Kern Super. Ct. No. BF188205A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gloria J. Cannon, Judge.

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ivan P. Marrs, and Chelsea Zaragoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant Joseph Smith was convicted of drawing or exhibiting a deadly weapon to resist arrest, misdemeanor vandalism and several counts for interfering with a peace officer. Defendant contends (1) there is insufficient evidence to support the jury's finding that he brandished a deadly weapon to resist arrest; (2) the trial court erred in failing to provide detailed instructions on whether the ax in defendant's possession constituted a deadly weapon; and (3) resentencing is required because the trial court found no aggravating factors before imposing the upper term on his revocation of probation. The People respond that there is sufficient evidence to support the conviction for brandishing a deadly weapon to resist arrest. The People concede the trial court erred in including the inherently deadly weapon instruction because an ax is not an "inherently deadly weapon" but argue that the error was harmless because the instruction included a valid theory of guilt. Lastly, the People contend that defendant forfeited his objection to his sentence by failing to object at the time of sentencing but concede that remand is warranted for resentencing if the claim is not forfeited. We affirm.

## PROCEDURAL SUMMARY

On December 20, 2021, in case No. BF188205A, the District Attorney of Kern County filed an information charging defendant with vandalism in excess of $400 (Pen. Code, § 594, subd. (b)(1);[1] count 1); drawing or exhibiting a deadly weapon to resist arrest (§ 417.8, subd. (a)(1); count 2); and misdemeanor interfering with a peace officer (§ 148, subd. (a)(1); count 3). As to counts 1 and 2, the information alleged that defendant had suffered one prior "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), which also qualified as a serious felony conviction (§ 667, subd. (a)).[2]

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] The trial was bifurcated for the prior conviction at defendant's request. Defendant waived his right to a jury trial regarding his prior conviction.

2.

Following trial, the trial court granted defendant's motion to reduce count 1 to a misdemeanor per section 1118.1 because there was insufficient evidence to support a felony conviction. (§ 1118.1.) The court also dismissed the prior strike conviction allegation on count 1. The court found there was sufficient evidence for the jury to decide if defendant brandished a deadly weapon to resist arrest and therefore denied defendant's request to dismiss count 2. The court granted the prosecution's motion to amend the information to allege four additional counts of interfering with a peace officer (§ 148, subd. (a)(1); counts 4–7).

On April 19, 2022, the jury found defendant guilty on all counts. In a bifurcated proceeding, the trial court found true the prior conviction allegations.

On June 2, 2022, the trial court sentenced defendant to an aggregate term of four years as follows: four years (the low term of two years doubled per the prior strike) on count 2; one year on count 1 to run concurrently with sentence for count 2; and one year each on counts 3 through 7 to run concurrently, stayed per section 654.

On February 7, 2019, in another matter, Bakersfield Superior Court case No. BF174179A, the trial court suspended imposition of sentence for a violation of section 422 and granted defendant three years' probation. On June 2, 2022, the trial court found that defendant had violated his probation by committing the offenses in Bakersfield Superior Court case No. BF188205A. The court revoked defendant's probation and sentenced him to three years (the upper term) on that conviction to run concurrently with the sentence in the Bakersfield Superior Court case No. BF188205A.

On June 7, 2022, defendant filed a timely notice of appeal with respect to Bakersfield Superior Court case No. BF188205A.[3]

---

[3] Defendant's counsel filed a notice of appeal, appealing from the judgment entered on June 2, 2022. However, she identified only Bakersfield Superior Court case No. BF188205A, but not Bakersfield Superior Court case No. BF174179A. The sentence in both cases was entered on the same date and defendant's present appeal challenges the judgment in both cases. The People noted that a notice of appeal was filed only in Bakersfield Superior Court case No. BF188205A, yet voiced no objection to

3.

# FACTUAL SUMMARY

Defendant's neighbor, R.A., lived in Bakersfield with his wife, son, and granddaughter. On November 25, 2021, R.A. had a work holiday but still woke up at 2:00 a.m. as he normally does.[4] He got up and watched television. At around 3:15 a.m., R.A. went back to bed. R.A. heard a "big thump" on the side of the house "three or four" minutes later. A "few seconds" later he heard a louder thump on the side of the house.

R.A. got up and opened the blinds to look in front of the house. He did not see anything outside from his room, so R.A. went to his son's room. R.A.'s son had not stayed at home that night. R.A. looked out a door in his son's room and saw two rocks laying in the driveway. He then saw defendant walk around the corner with a baseball bat and a 5-to-6-inch diameter rock in his hand. Defendant raised back the bat with one hand and threw the rock towards the window of R.A.'s son's room. R.A. "jumped down on the ground" behind a dresser and television set. The rock came through the window shattering glass onto R.A. The rock ripped the window blinds apart and created a hole in the wall inside the room, ultimately landing on R.A.'s son's bed. R.A. called 911 to report the incident.[5]

Kern County Sheriff's Deputies Zachary Richmond and Daniel Rickard were dispatched to defendant's house to conduct a vandalism investigation. Rickard requested a records check on defendant over the radio and was advised that defendant was on active

---

consideration of argument in Bakersfield Superior Court case No. BF174179A. The People would not be prejudiced by our consideration of defendant's argument in the latter case. For those reasons, we liberally construe defendant's notice of appeal as an appeal from both judgments. (See Cal. Rules of Court, rule 8.304(a)(4) ["The notice of appeal must be liberally construed"].)

[4] R.A. sets his alarm for 2:00 a.m. because his reporting time for work is 4:00 a.m. Even if his alarm is off, R.A. testified that he still wakes up at 2:00 a.m.

[5] R.A.'s neighbor directly across the street from his house captured video footage of the incident, which was admitted as evidence at trial.

4.

probation.[6]

Deputy Richmond knocked on defendant's door and identified the deputies as from the sheriff's office. Deputy Rickard told defendant to come outside. Defendant refused. Rickard told defendant that he was on probation and under arrest for vandalism, so he needed to come out of the house. Defendant denied vandalizing anything and refused to come out. The deputies repeatedly asked defendant to come out of the house.[7] Defendant said multiple times that he was not coming out and was not going to jail. Rickard tried to kick the front door open but was unable to open the door. He believed the door was barricaded because the door did not budge when he kicked it and based on movement heard in the house prior to Rickard's attempt to kick the door in.

While Deputy Rickard tried to get defendant to come out, Deputy Richmond watched defendant in the house through a window. Richmond saw defendant continually walking to and from the hallway holding an ax in his right hand down toward his waist.[8] One of the deputies told defendant to put the ax down. Defendant responded: "You're not taking me. I didn't do anything." Richmond also tried to speak with defendant to get him to come out. Further exchanges between defendant and the deputies included the following:

"[Defendant]: …I'm under arrest.

"UNKNOWN DEPUTY: Yes. You are under arrest.

"[Defendant]: I'm the victim.

---

[6] Defendant's probation included search terms requiring that he submit voluntarily to a search of his person, vehicle, or residence at the request of a peace officer without the necessity of a search warrant or probable cause.

[7] The deputies were wearing body cameras, which recorded their exchanges with defendant. Portions of the video footage from the deputies' cameras were admitted into evidence.

[8] Deputy Richmond also referred to the object as a "large hatchet." Richmond testified that he considered the word hatchet synonymous with a small ax.

"UNKNOWN DEPUTY:  That is not gonna change no matter what you say or do.

"[Defendant]:  You want to bet?

"UNKNOWN DEPUTY:  Yes.

"[Defendant]:  You want to f[***]in' bet?

"UNKNOWN DEPUTY:  Yes.  It's gonna – you're gonna be the...

[…]

"UNKNOWN DEPUTY:  You're gonna be under arrest no matter what.

"[Defendant]:  I'm not – I am not going to let you do that to me.  I think I'm very clear.

"UNKNOWN DEPUTY:  Can't see.

"[Defendant]:  I don't have to put up with that shit.  And I'm not gonna. F[**]k that.

"UNKNOWN DEPUTY:  No matter what you say, Joseph, you're under arrest.

"[Defendant]:  You want to bet?  You want to f[***]in' bet, homeboy?

"UNKNOWN DEPUTY:  You are under arrest, Joseph.  Yes.

"[Defendant]:  You want to bet?

At one point defendant raised the ax and hit the wall with it.  Deputy Richmond also saw defendant holding a large knife.

The standoff between defendant and the deputies continued for approximately three hours.  The Kern County Sheriff's Office SWAT team was dispatched to defendant's house.  Deputy Rogelio Medina with the SWAT team testified that there are criteria that must be met before the SWAT team will be called out including the severity of the crime, the threat the subject has posed to the deputies involved, and the weapons that have been used during the crime.  Medina told defendant through a public address sound system (PA system) on the patrol vehicle to come out of the house several times to

6.

no avail. The SWAT team breached the front door of defendant's house with equipment attached to its armored vehicle. The front door of defendant's house came off its hinges. Molina saw defendant run from the living room through the hallway. The deputies told defendant several times to exit the house, but he would not comply. Molina deployed a "less lethal" weapon and hit defendant in the torso. Defendant came out of the house on his own and was arrested.

## DISCUSSION

### I.    Sufficiency of the Evidence

Defendant contends there is insufficient evidence to reasonably conclude he brandished a deadly weapon to resist arrest.

#### A.    *Standard of Review*

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict – i.e., evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

**B.** *Applicable Law and Analysis*

The elements of the offense under section 417.8 are "(1) the drawing or exhibiting of a firearm or a deadly weapon, (2) with the intent to resist or prevent arrest or detention of oneself or another by a peace officer." (*People v. Simons* (1996) 42 Cal.App.4th 1100, 1109.) A violation of section 417.8 does not require the arrest was lawful or the officer was engaged in the performance of his or her duties. (*Simons*, at pp. 1109–1110.) "The chief evil to be avoided by criminalizing exhibition of weapons is the potential for further violence, not only by the defendant, but also by others in response to the defendant's action." (*Id.* at p. 1109.) Defendant concedes he may have willfully resisted the deputies' attempts to take him into custody but contends he did not brandish a deadly weapon within the meaning of section 417.8.

It is well established that there are two classes of deadly weapons: " 'first, those instrumentalities which are weapons in the strict sense of the word, and, second, those instrumentalities which are not weapons in the strict sense of the word, but which may be used as such. The instrumentalities falling in the first class, such as guns, dirks and blackjacks, which are weapons in the strict sense of the word and are "dangerous or deadly" to others in the ordinary use for which they are designed, may be said as a matter of law to be "dangerous or deadly weapons." This is true as the ordinary use for which they are designed establishes their character as such. The instrumentalities falling into the second class, such as ordinary razors, pocket-knives, hatpins, canes, hammers, hatchets and other sharp or heavy objects, which are not weapons in the strict sense of the word and are not "dangerous or deadly" to others in the ordinary use for which they are designed, may not be said as a matter of law to be "dangerous or deadly weapons." When it appears, however, that an instrumentality other than one falling within the first class is capable of being used in a "dangerous or deadly" manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, … its character as a "dangerous or deadly

8.

weapon" may be thus established, at least for the purposes of that occasion.' " (*People v. Graham* (1969) 71 Cal.2d 303, 327–328 (*Graham*).)

Defendant did not argue at trial and does not argue here that the ax did not constitute a deadly weapon under section 417.8. An ax is not an inherently deadly weapon because its ordinary use, such as to chop wood, is not dangerous or deadly as a matter of law. (*Graham*, *supra*, 71 Cal.2d at p. 327 [referring to "hatchets" among examples of objects that are not a deadly weapon in the strict sense of the word].)[9] An ax constitutes a deadly weapon under section 417.8 if it is "capable of deadly use and … the defendant intends to so use it if need be." (*People v. Simons*, *supra*, 42 Cal.App.4th at p. 1107 [a screwdriver used by defendant to resist arrest was a deadly weapon]; see also *People v. Aledamat* (2019) 8 Cal.5th 1, 6 (*Aledamat*) [" 'In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' "].)

Where an object that is a weapon as a matter of law "is drawn or exhibited in the presence of a peace officer, the intent to use it to resist arrest or detention may be established solely from the context in which it is drawn or exhibited (i.e., after a subject is told to raise his or her hands or that he or she is under arrest), regardless of the manner in which the weapon is drawn or exhibited. [¶] Likewise, where the instrument is not a deadly weapon as a matter of law, the intent to use it for the purpose of resisting arrest or detention can be inferred from the context in which it is drawn (again, for example, when a subject is told to raise his or her hands or that he or she is under arrest)." (*People v. Pruett* (1997) 57 Cal.App.4th 77, 87 (*Pruett*).) Since an ax is not a deadly weapon as a matter of law whether defendant intended to use the ax to resist arrest may be inferred

---

[9] Deputy Richmond referred to the object interchangeably as a hatchet and an ax. We do not discern a meaningfully distinction between the two based on the object defendant used and the circumstances in this case. (See American Heritage Dict. (5th desk ed. 2013) p. 388, col. 1 [hatchet is defined as "[a] small, short-handled ax"].)

from the context in which it was drawn. (*Ibid*.)

Defendant contends that brandishing requires more than mere possession of the weapon and there is no evidence he displayed the ax in a menacing manner to any of the officers. Unlike other brandishing offenses (e.g., § 417),[10] section 417.8 does not require that defendant displayed the ax in a rude, angry, or threatening way to the officers.[11] The court in *Pruett* held that misdemeanor brandishing under section 417 is not a lesser included offense of section 417.8 because section 417 "requires that a defendant draw or exhibit a deadly weapon in a 'rude, angry or threatening manner' and … section 417.8 does not include such terminology." (*Pruett*, *supra*, 57 Cal.App.4th at p. 87.) Unlike for a violation of section 417, "it is not necessary that the instrument be drawn or exhibited in a specific way – that is, in a 'rude, angry or threatening manner' – to constitute a violation of section 417.8." (*Pruett*, at p. 88.) It is thus sufficient that defendant exhibited or drew the ax in a way from which it could be inferred that he intended to use it to resist arrest to show a violation of section 417.8. (*Id*. at p. 87.)

Defendant was holding the ax in his hand while arguing with the deputies about coming out of his house. The deputies asked him to put down the ax, to which he responded: "You're not taking me. I didn't do anything." Defendant raised the ax and hit the wall with it at one point. He was also seen holding a knife. Defendant repeatedly said he would not come out and refused to do so for more than three hours. He sometimes used threatening language in response to the deputies saying he was under arrest and said multiple times he was not going to be arrested or go to jail. There were

---

[10] Section 417, subdivision (a)(1) provides: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor, punishable by imprisonment in a county jail for not less than 30 days."

[11] "[B]randishing consists of drawing or exhibiting, in the presence of another person, any firearm, whether loaded or unloaded, [or deadly weapon] *in a rude, angry or threatening manner*." (*People v. Sanders* (1995) 11 Cal.4th 475, 542, italics added.)

10.

indications that defendant barricaded his front door. Defendant was also on probation and subject to search of his residence with or without probable cause or a warrant. The lengthy standoff, defendant's hostile responses to the deputies' repeated requests to come out and hitting the ax against the wall reflect that defendant would not willingly be taken into custody. His threatening language indicated an intent to resort to force to resist arrest. The SWAT team was ultimately required to be dispatched to remove defendant's door and compel him to surrender. Even after the SWAT team removed defendant's front door from its hinges, defendant initially ran away inside his house. A rational trier of fact could infer by defendant's obstinate conduct and threatening language that he intended to use the ax to resist arrest.

Defendant argues that the trial court's interpretation of the evidence at sentencing supports that although he was in possession of the ax, he did not brandish it within the meaning of section 417.8.[12] The trial court is required to "state the reasons for its sentence choice on the record at the time of sentencing." (§ 1170, subd. (c); see also Cal. Rules of Court, rule 4.406(b).) In selecting between the middle and lower terms of imprisonment, the court may consider circumstances in aggravation or mitigation including factors relating to the crime. (Cal. Rules of Court, rules 4.420(d), 4.421, 4.423.) The court's discussion of the evidence during sentencing suggest it found circumstances in mitigation warranted imposition of the low term of four years for his conviction on section 417.8. That the trial court found circumstances in mitigation related to the crime does not mean the evidence is insufficient to support defendant's conviction. The inquiry is whether "*any* rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Zamudio*, *supra*,

_____

[12] At the time of sentencing, the trial court stated: "The brandishing that the jury found him guilty of was an ax that he had in his hand when the officers were securing the premises and looked through the window and saw him with this ax in his hand. He never held it up to an officer. He never waved it at an officer. He never threatened an officer with it, but instead the – clearly the jury found him guilty of having the ax during the commission of refusing to come out of his home, and that is the verdict."

43 Cal.4th at p. 357.) As discussed above, a rational trier of fact could have found that defendant exhibited or drew the ax to resist arrest in violation of section 417.8. There is thus substantial evidence to support the jury's verdict.

## II. Instructional Error

Defendant contends that the trial court erred in failing to provide the jury with detailed instructions regarding whether the ax constituted a deadly weapon under section 417.8. The People concede the trial court erred in including the inherently deadly weapon instruction because an ax is not an inherently deadly weapon. However, the People argue that the error was harmless because the instruction included a valid theory of guilt.

### A. *Additional Background*

The trial court defined for the jury a deadly weapon using CALCRIM No. 982 in its instructions on the charge of violating section 417.8: "A deadly weapon is any object, instrument or weapon that is inherently deadly or that is used in such a way that is capable of causing or likely to cause death or great bodily injury. An object that [*sic*] is inherently deadly is [*sic*] if it is deadly or dangerous in its ordinary use for which it was designed. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." Defendant did not object to this instruction at trial or request amplification of the definition of a deadly weapon.

### B. *Applicable Law and Analysis*

We review defendant's claim of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)[13] "A trial court has a duty to instruct, sua sponte, when a term used in the instructions has 'a technical meaning peculiar to the law....' " (*Pruett, supra*, 57 Cal.App.4th at p. 81.) "The general rule which provides that in defining the elements of a crime it is enough for the court to instruct in the language of the statute

---

[13] The People do not argue that defendant forfeited his objection to the jury instructions by failing to object at trial and we do not address the issue of forfeiture.

when the defendant fails to request an amplification thereof [citation] will not prevail when the jury would have difficulty in understanding and applying the statute. Under such circumstances, a court must give additional guidance and clarification on its own motion." (*Graham*, *supra*, 71 Cal.2d at p. 329.)

The "term 'deadly weapon' has taken on a technical meaning in certain contexts." (*Pruett*, *supra*, 57 Cal.App.4th at p. 82.) As discussed above, there are objects that are inherently deadly weapons (such as a gun). (*Graham*, *supra*, 71 Cal.2d at p. 327.) An object that is not an inherently deadly weapon constitutes a deadly weapon where it is " 'capable' of being used in a deadly fashion," and the defendant intends "that it serve such a purpose when the crime is committed." (*Pruett*, *supra*, 57 Cal.App.4th at p. 85.) Where the object used is not an inherently deadly weapon, "an instruction which establishes [the object's] nature ('deadly' or not) by reference to its use may be required." (*Ibid.*)

To decide whether defendant exhibited or drew a deadly weapon to resist arrest in violation of section 417.8, the jury was required to determine if the ax was a deadly weapon. The jury instructions defined a deadly weapon as "any object, instrument or weapon that is inherently deadly or that is used in such a way that is capable of causing or likely to cause death or great bodily injury." The instructions further defined "inherently deadly" as an object that is "deadly or dangerous in its ordinary use for which it was designed."

The trial court provided the jury with two possible theories of guilt: (1) that the ax was inherently deadly or (2) that defendant used the ax in a deadly way. The instruction accurately stated the law. However, an ax is not an inherently deadly weapon.[14] The first theory was consequently erroneous on the facts. (See *Aledamat*, *supra*, 8 Cal.5th at p. 3 [inclusion of inherently deadly weapon instruction for assault with a box cutter was "erroneous under the facts" since a box cutter is not a deadly weapon as a matter of law];

---

[14] The People concede that an ax is not an inherently deadly weapon.

13.

see also *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*) ["error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case"].) The second theory was correct.

Our Supreme Court in *Aledamat* addressed the standard of review where the trial court commits an alternative-theory error by providing two theories of guilt, one correct and one incorrect. (*Aledamat*, *supra*, 8 Cal.5th at pp. 7, fn. 3, 9–13.) The defendant in *Aledamat* thrust a box cutter at the victim while saying, " ' "I'll kill you." ' " (*Id.* at pp. 4–5.) He was convicted of assault with a deadly weapon (§ 245) and making criminal threats (§ 422). (*Aledamat*, at p. 5.) The trial court "defined 'a deadly weapon' as 'any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or … great bodily injury.' " (*Id.* at p. 4.) Because the defendant used a box cutter in the assault – not an inherently deadly weapon – the Supreme Court held that the trial court erred in providing the jury with two theories by which it could find the box cutter a deadly weapon, one correct and one incorrect. (*Id.* at p. 7.)

The Supreme Court then distinguished between two categories of incorrect theories: legal and factual. (*Aledamat*, *supra*, 8 Cal.5th at p. 7.) " 'A legal error is an incorrect statement of law, whereas a factual error is an otherwise valid legal theory that is not supported by the facts or evidence in a case. [Citation.] Between the two, legal error requires a more stringent standard for prejudice, for jurors are presumed to be less able to identify and ignore an incorrect statement of law due to their lack of formal legal training. [Citation.] Factual errors, on the other hand, are less likely to be prejudicial because jurors are generally able to evaluate the facts of a case and ignore factually inapplicable theories.' " (*Id.* at p. 8.) The Supreme Court concluded that the trial court committed a legal error because a box cutter is not inherently deadly as a matter of law and the jury was never provided with a definition of "inherently deadly." (*Id.*; see also *People v. Stutelberg* (2018) 29 Cal.App.5th 314, 318–319 [trial court committed legal

14.

error where the jury was never provided with a definition of "inherently deadly" for an assault committed with a box cutter].) "Because the trial court … did not define what 'inherently deadly' meant, the jury would not be equipped to know that, contrary to what the instruction suggested, a box cutter is *not* an inherently deadly weapon." (*Aledamat*, *supra*, 8 Cal.5th at p. 8.) The Court concluded this type of "alternative-theory error is subject to the more general [*Chapman v. California* (1967) 386 U.S. 18] harmless error test. The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id.* at p. 13.) Applying this standard, the Court found the error harmless beyond a reasonable doubt. (*Id.* at pp. 13–15.)

The People argue that the trial court here committed solely a factual error because the court did include the definition of "inherently deadly" in the jury instructions. (See *Aledamat*, *supra*, 8 Cal.5th at p. 8 [noting that the error would be factual if the trial court had instructed the jury that only a few items that are designed to be used as deadly weapons are inherently deadly].) Where the trial court provides an instruction that correctly states the law, but the instruction does not apply to the facts, the error is "one of state law subject to the traditional [*People v. Watson* (1956) 46 Cal.2d 818] test applicable to such error." (*Guiton*, *supra*, 4 Cal.4th at pp. 1130.)

Defendant argues that the error is subject to the *Chapman* standard because the trial court did not provide additional instruction to the jury for how to determine whether the ax was employed in a manner to support a conviction under section 417.8. The trial court instructed the jury on the definition of a deadly weapon as "any object, instrument or weapon … *that is used in such a way that is capable of causing and likely to cause death or great bodily injury*."[15] The instructions delineated that: "Great bodily injury

---

[15] The instruction the trial court gave the jury mirrors the model jury instruction for violating section 417.8 (CALCRIM No. 982).

15.

means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." The jury necessarily had to determine if defendant used the ax in a way capable of causing or likely to cause death or great bodily injury to find defendant guilty under this theory. This is essentially the same inquiry as determining whether an ax is " 'capable' of being used in a deadly fashion," and the defendant intends "that it serve such a purpose when the crime is committed." (*Pruett*, *supra*, 57 Cal.App.4th at p. 85.) Defendant could have requested amplification of this instruction.[16] His failure to do so does not render the error here of federal constitutional dimensions on appeal. (See *People v. Andrews* (1989) 49 Cal.3d 200, 218 ["Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language"].)

Assuming arguendo the instruction here amounted to a legal error, the Supreme Court in *Aledamat* expressly rejected the more stringent test advocated by defendant that an alternative-theory "error requires reversal unless there is a basis in the record to find that 'the jury has "*actually*" relied upon the valid theory ....' " (*Aledamat*, *supra*, 8 Cal.5th at p. 9.) Even if the error is treated as a legal one, we examine the entire cause, including the evidence, and consider all relevant circumstances in determining whether the error was harmless beyond a reasonable doubt. (*Id.* at p. 10.) "[A] reviewing court must be persuaded that, in light of the jury's findings and the evidence at trial, any rational juror who made those findings would have made the additional findings necessary for a valid theory of liability, beyond a reasonable doubt, if the jury had been properly instructed. [Citation.] If the reviewing court determines beyond a reasonable

---

[16] CALCRIM No. 982 offers the following bracketed instruction: "In deciding whether an object is a deadly weapon, consider all the surrounding circumstances." Jury instructions in brackets "provide optional choices that may be necessary or appropriate, depending on the individual circumstances of the case." (Judicial Council of Cal., Criminal Jury Instn. (2022) p. xxvi.)

doubt that any rational juror would have made the additional findings, based on the jury's actual verdict and the evidence at trial, the error is harmless because the presentation of the invalid theory to the jury made no difference. The error did not contribute to the verdict." (*In re Lopez* (2023) 14 Cal.5th 562, 589.) We conclude the error here was harmless.

The jury instructions defined an inherently deadly weapon as "deadly or dangerous in its ordinary use for which it was designed." The jury was further instructed that "[s]ome words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions." The instructions elsewhere stated: "Some of these instructions may not apply, depending on your findings about the facts of the case." The jury was provided with a theory of guilt that the ax was an inherently deadly weapon, a theory that was erroneous on the facts. However, the jury could reasonably have concluded that this theory was not applicable based on the definition given of an inherently deadly weapon, as well as the instruction that some instructions may not apply depending on the jury's findings. (See e.g., *Guiton*, *supra*, 4 Cal.4th at p. 1129 [reversal is not required for a factually inadequate theory where there remains a valid ground for the verdict because the jury is fully equipped to detect inadequacy of proof that is purely factual].)

As noted, the alternative theory instructed upon in this case required finding that the ax was "used in such a way that it is capable of causing and likely to cause death or great bodily injury." As in *Aledamat*, whether the ax was a deadly weapon was essentially uncontested. (*Aledamat*, *supra*, 8 Cal.5th at p. 14 ["Although defense counsel did not expressly concede that the box cutter was a deadly weapon, he did not contest the point"].) Defendant did not argue that the ax was not a deadly weapon. Based on the photograph of the ax such an argument would have been futile. (*Ibid.* [futile to argue the box cutter was not a deadly weapon].) Instead, defense counsel focused on whether

17.

defendant brandished the ax within the meaning of section 417.8, an argument the jury necessarily rejected when it found defendant drew or exhibited a deadly weapon with the intent to resist arrest.[17] "[D]rawing or exhibiting an instrument which is 'capable' of killing another with the intent to resist arrest or detention is sufficient to establish both that the instrument in question was a deadly 'weapon' (or 'deadly weapon') and that its use constituted a violation of section 417.8." (*Pruett*, *supra*, 57 Cal.App.4th at pp. 87–88.) Implicit in the jury's finding that defendant drew or exhibited the ax to resist arrest is a finding that the ax constituted a deadly weapon as used. (*Aledamat*, *supra*, 8 Cal.5th at pp. 14–15 [harmless error where it would be impossible on the evidence for the jury to necessarily find what it did without also finding the missing fact as well]; see also *In re Lopez*, *supra*, 14 Cal.5th at p. 589 [the proper analysis under *Aledamat* is "whether the jury could have found what it did find without also making the findings necessary for a valid theory"].)

Defendant contends that the People in their final argument repeatedly referred to the ax as an inherently deadly weapon. This is factually inaccurate. In closing argument, the prosecutor discussed the ax as a deadly weapon: "A deadly weapon is any object, instrument or weapon that is inherently deadly or one that is used in such a way that is capable of causing or likely to cause great death or bodily injury. I don't believe there's going to be a lot of contention of whether the ax in this situation was a deadly weapon. We've seen the size of the ax. There's no testimony that this ax wasn't a real ax, and that

---

[17] The jury instructions outlined the elements of the offense per CALCRIM No. 982:

> To prove that the defendant is guilty of this crime, the People must prove that [¶] 1. The defendant drew or exhibited a deadly weapon [¶] AND [¶] 2. When the defendant drew or exhibited the deadly weapon, he intended to resist arrest or to prevent a peace officer from arresting or detaining him.

As previously discussed, it is sufficient that defendant exhibited or drew the ax in a way from which it could be inferred that he intended to use it to resist arrest. (*Pruett*, *supra*, 57 Cal.App.4th at p. 87.)

ax was absolutely likely of causing – could cause death or great bodily injury. [¶] An ax is made for chopping trees, as we all know. Decent amount of time with that ax, no time with that ax, one good chop of that ax could definitely do great bodily harm or injury. The definition for great bodily harm or injury, it means significant or substantial injury greater than minor or moderate harm. You can definitely chop off a limb with that ax." Rather than compelling the jury to apply an incorrect theory to this charge, the prosecutor's closing argument acknowledged that the ordinary use of an ax is chopping. This argument implicitly recognized that the ax was *not* an inherently deadly weapon and that the jury must determine if the ax was capable of causing death or great bodily injury as part of its inquiry. If anything, the prosecutor's closing argument steered the jury to apply the correct theory of guilt rather than the incorrect one. (See *People v. Powell* (2021) 63 Cal.App.5th 689, 715–716 [instructional error was harmless in part because the prosecutor never argued the incorrect legal theory]; *Aledamat*, *supra*, 8 Cal.5th at p. 14 [unlikely the jury applied the incorrect legal theory where neither counsel "ever suggested to the jury that there were two separate ways it could decide whether the box cutter was a deadly weapon"].)

Defendant contends that the instructional error likely resulted in the jury finding him guilty based solely on his possession of the ax without making a finding that he used it as a deadly weapon within the meaning of section 417.8. This argument is essentially a reiteration of his sufficiency of the evidence argument. We have already rejected this contention.

We are convinced the instructional error was harmless beyond a reasonable doubt. No reasonable jury who made the findings in the verdict and heard the evidence at trial could have failed to make the findings necessary to convict defendant on the valid theory of the ax as a deadly weapon as used. (*In re Lopez*, *supra*, 14 Cal.5th at p. 589; see also *Neder v. United States* (1999) 527 U.S. 1, 17 [erroneous instruction is harmless where the missing element is uncontested and supported by overwhelming evidence].)

19.

**III.    Sentence for Revocation of Probation**

Defendant contends that remand for resentencing is required because the trial court found no aggravating factors before imposing the upper term of three years on his revocation of probation.  The People respond that defendant forfeited his objection to imposition of the upper term by failing to object at the time of sentencing.  We agree with the People that defendant forfeited objection to this sentence.

**A.    *Additional Background***

On October 22, 2018, the District Attorney of Kern County charged defendant with one count of making criminal threats (§ 422) in case No. BF174179A.  On January 7, 2019, defendant entered into a plea agreement by which he pled no contest to the charge in exchange for a three-year probation period.  The plea agreement included the following clause: "If at any time while [defendant is] on probation [he is] found to be in violation of the terms and conditions of [his] probation, [his] probation could be revoked and [he] could be sentenced to state prison or a term in the county jail or be placed on mandatory supervision for the maximum of 3 years."  On February 7, 2019, a sentencing hearing was held, and the trial court granted defendant probation per the agreement.  The docket reflects that imposition of sentence was suspended and defendant was placed on probation for three years to expire on February 7, 2022.[18]

Defendant was therefore still on probation when he committed the November 25, 2021 offenses (case No. BF188205A).  Immediately following the jury's verdict, the trial court found defendant violated probation based on his conviction and the evidence related to those crimes.  On June 2, 2022, the court imposed sentence on defendant's revocation of probation in case No. BF174179A at the same time sentence was imposed for the November 25, 2021 offenses.  The probation officer's report recommended defendant's

---

[18] The docket reflects multiple hearings for violations of probation between July 12, 2019, and February 3, 2021, but sentence was not imposed in case No. BF174179A prior to June 2, 2022.

probation be revoked and defendant be sentenced to the upper term of three years in that case. The court followed this recommendation: "As to the case BF174179A, which is his revocation matter, Count 1 is Penal Code Section 422. [¶] I'll revoke his probation in that matter. I'll sentence him to the Department of Corrections for the upper term of three years." The sentence was to be served concurrent with defendant's sentence for case No. BF188205A. Following the court's pronouncement of sentence, both parties confirmed to the court that there was nothing further to address. At no point did defendant object the sentence imposed or argue that the trial court was required to submit the facts underlying any aggravating factors to the jury for a finding beyond a reasonable doubt based on the recent modifications to section 1170.

### B.    *Applicable Law and Analysis*

"When the trial court in a criminal case decides at time of sentencing to grant the defendant probation, the court may either suspend imposition of sentence or actually impose sentence but suspend its execution. (See … § 1203.1, subd. (a).) If the court has suspended imposition of sentence and later revokes the defendant's probation, then the court has undisputed authority to choose from all the initially available sentencing options. (§ 1203.2, subd. (c).)" (*People v. Howard* (1997) 16 Cal.4th 1081, 1084, fn. omitted.)

Here, defendant was placed on probation in case No. BF174179A with imposition of sentence suspended. The plea agreement did not specify a prison term to be imposed if probation was revoked, it merely stated that defendant could be sentenced for up to three years, the statutory maximum on the sole count for violating section 422. (§§ 422, subd. (a), 1170, subd. (h)(1).) When the trial court revoked defendant's probation following the verdict in the present case, the court had the discretionary authority to "pronounce judgment for any time within the longest period for which the person might have been sentenced." (§ 1203.2, subd. (c); see also Cal. Rules of Court, rule 4.435(b)(1).) The court's discretion to impose the lower, middle, or upper term of

21.

imprisonment after defendant's probation was revoked was not limited by the plea agreement or a prior imposition and suspension of sentence. (*People v. Howard*, *supra*, 16 Cal.4th at p. 1087 [the court "unquestionably … had full sentencing discretion on revoking probation" when imposition of sentence had been suspended].)

Defendant contends that recent amendments to section 1170 per Senate Bill No. 567 (2021−2022 Reg. Sess.) (Senate Bill 567) required the court to impose a sentence no greater than the midterm sentence following revocation of his probation. Effective January 1, 2022, Senate Bill 567 amended section 1170, subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Prior to its amendment by Senate Bill 567, section 1170 provided, in relevant part: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." (§ 1170, former subd. (b).) Section 1170, subdivision (b)(2) now provides: "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." A trial court may also rely on certified records of conviction to determine prior convictions without submitting the matter to a jury. (§ 1170, subd. (b)(3).)

The trial court imposed sentence in both defendant's cases on June 2, 2022. The ameliorative changes wrought by Senate Bill 567 had thus been in effect for approximately five months when defendant was sentenced. The only discussion during the sentencing hearing about aggravating or mitigating circumstances were in relation to defendant's conviction for violating section 417.8 on November 25, 2021, for which the court imposed the low term of four years.[19] The court did not discuss aggravating

<hr />

[19] The probation officer's report identified no mitigating circumstances and recommended the trial court find true three aggravating circumstances for sentence on the

circumstances warranting imposition of the upper term for the revocation of probation in case No. BF174179A or state reasons why the upper term was being imposed.

Defendant contends the matter should be remanded for resentencing because the trial court stated no factors in aggravation before imposing the upper term for the revocation of probation. Defendant did not object at sentencing that the sentence was inconsistent with Senate Bill 567. He forfeited the issue on appeal by failing to raise the applicability of Senate Bill 567 after the effective date of amended section 1170. (*People v. Scott* (1994) 9 Cal.4th 331, 351 [lack of a timely and meaningful objection at the time of sentencing forfeits the claim on appeal]; *People v. Flowers* (2022) 81 Cal.App.5th 680, 683–684, review granted Oct. 12, 2022, S276237.) The trial court pronounced sentence and expressly asked the parties if there was anything further to address. Defendant was thus provided with a meaningful opportunity to object to the sentence but failed to do so. (*People v. Gonzalez* (2003) 31 Cal.4th 745, 752 ["It is only if the trial court fails to give the parties any meaningful opportunity to object that the *Scott* rule becomes inapplicable"].) The court's failure to state the reasons for imposing the upper term does not rescue defendant's claim. (*Scott*, at p. 352 [defendant cannot complain for the first time on appeal that the trial court failed to state the reasons for its sentencing choice].) Nor is the sentence imposed unauthorized by law such that defendant's failure to object may be excused. (*Id.* at p. 354 [appellate courts are willing to intervene in the first instance to correct a sentence that could not lawfully be imposed].) The three-year sentence imposed was a lawful term for defendant's conviction under section 422. (§§ 422, subd. (a), 1170, subd. (h)(1).)

---

November 25, 2021 crimes (case No. BF188205A): defendant's prior convictions were numerous (Cal. Rules of Court, rule 4.421(b)(2)); defendant was on probation at the time of the crime (Cal. Rules of Court, rule 4.421(b)(4)); and defendant's prior performance on probation was unsatisfactory in that he failed to comply with the terms and continued to reoffend (Cal. Rules of Court, rule 4.421(b)(5)).

In conclusion, defendant forfeited objection to imposition of the upper term on the revocation of probation by failing to object at the time of sentencing.

## DISPOSITION

The judgment is affirmed.

POOCHIGIAN, Acting P. J.

WE CONCUR:


FRANSON, J.


PEÑA, J.